IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TRACY A. READE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 1:12-CV-216 |
| | ) |
| CAROLYN W. COLVIN[1], | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff, Tracy A. Reade. For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

BACKGROUND

On January 21, 2009, Tracy A. Reade ("Reade" or "claimant") applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 et seq. and

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25, Carolyn W. Colvin is automatically substituted as the Defendant in this suit.

Supplemental Security Insurance ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. sections 1381 et seq. The applications indicated that Reade's disability began on April 1, 2008.

The Social Security Administration denied Reade's initial applications for benefits and also denied his claims on reconsideration. On November 15, 2010, Reade appeared with counsel at an administrative hearing before Administrative Law Judge Bryan J. Bernstein ("ALJ Bernstein"). Testimony was provided by the claimant, Betty Jean Reade (the claimant's mother), and Sharon D. Ringenberg (a vocational expert). On February 24, 2011, ALJ Bernstein denied the claimant's DIB and SSI claims, finding that Reade had not been under a disability as defined in the Social Security Act.

The claimant requested that the Appeals Council review the ALJ's decision and the request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a)(2005). The claimant has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 1383(c).

DISCUSSION

Reade was born on December 4, 1966. He alleges the following impairments: bipolar disorder, depression, and asthma. His past

relevant work includes telemarketing and dishwashing.  The medical evidence of record is adequately summarized by the claimant's counsel and, in a nutshell, is as follows:

Reade was diagnosed with depression and bipolar disorder as early as September 17, 2004, when his doctors noted that he "[d]efinitely has manic episodes which has cost him a few jobs." (Tr. 409).  At that time, he was prescribed Risperdal because Zoloft and Wellbutrin had not worked for him in the past. (Tr. 409).

On January 11, 2005, Linda Bertsche, APRN, BC, and Tim C. McFadden, M.D., of the Oaklawn Psychiatric Center performed a psychiatric evaluation.  (Tr. 591-94).  They diagnosed Reade with bipolar II disorder, assigned him a Global Assessment of Functioning ("GAF") score of 59[2], and opined that it "is doubtful that [Reade] could currently manage the stress inherent in the type of employment that would provide him benefits." (Tr. 593-94).

Reade was admitted to Parkview Behavioral Health on April 10, 2006, after attempting suicide by overdose.  (Tr. 426).  Reade was discharged on April 14, 2006, but admitted again on April 17, 2006, with suicidal thoughts.  (Tr. 426, 419-20).  He felt "unsafe," had a panic attack, and was jittery and restless.  (Tr. 419-20).

Gary W. Elliot, Ph.D., performed a psychiatric evaluation of

---

[2] GAF is a scoring system for measuring an individual's overall functional capacity.  A GAF of 59 would indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.

Reade on May 23, 2006, for SSA. (Tr. 445-47). Reade reported that he tried to commit suicide in 1989, which led to his first diagnosis of bipolar disorder. (Tr. 445). He reported a sad mood, anxiety, and fitful sleep. (Tr. 445). Dr. Elliot diagnosed Reade with a bipolar disorder, not otherwise specified, and a substance-related disorder, not otherwise specified. (Tr. 447).

On March 20, 2007, Revathi Bingi, Ed.D., examined Reade and administered a Wechsler Adult Intelligence Scale-III. (Tr. 495-499). Reade received a verbal IQ score of 91 (in the average range), a performance IQ score of 77 (in the borderline range), and a full scale IQ score of 84 (in the low average range). (Tr. 500-505). Dr. Bingi diagnosed Reade with dysthymic disorder; panic disorder without agoraphobia, in remission; polysubstance dependence, in early remission; bipolar disorder, historically; and possible borderline intellectual functioning; and assigned Reade a GAF score of 55.[3] (Tr. 499).

At the July 8, 2009, mental status examination conducted by Robert J. Walsh, Psy.D., Reade again reported depressive lows and manic highs. (Tr. 539-41). His manic highs sometimes included physical violence so he tried not to be around a lot of people when in a manic state. (Tr. 539). According to Dr. Walsh, Tracy reported that his depression included "not doing anything at all,

---

[3] A GAF of 55 is in the same range as his previous GAF of 59 and would indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.

staying by himself and not wanting to do anything." (Tr. 539). Dr. Walsh diagnosed Reade with a mood disorder, not otherwise specified, and methamphetamine abuse, and assigned him a GAF score of 50.[4] (Tr. 541).

Reade was admitted to Parkview Behavioral Health for a third time on September 28, 2009, for suicidal thoughts and depression. (Tr. 610). He was discharged on October 2, 2009. (Tr. 610). At admission, he was assigned a GAF score of 30.[5] (Tr. 604). At discharge, that score had increased to 50, and he was diagnosed with bipolar disorder, mixed episode; amphetamine dependence, continuous, severe; cannabis dependence, not otherwise specified; and borderline intellectual abilities. (Tr. 610). Dr. Gladys Beale, M.D., noted that his condition improved during his hospitalization and that upon release he was oriented with an intact memory and fair insight and judgment. (Tr. 610).

A physical consultative exam by Dr. Michael Holton, M.D., in July of 2009, indicated that Reade had no significant physical limitations. (Tr. 556-558).

In December of 2009, a mental status exam was performed by Phoebe Ritter, APN, and approved by a supervising physician whose signature is not legible. (Tr. 692). Reade was diagnosed with

---

[4] A GAF of 50 would indicate serious symptoms or any serious impairment in social, occupational, or school functioning.

[5] A GAF of 30 would indicate behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment, or inability to function in almost all areas.

major depressive disorder, recurrent and severe, but without psychosis, and an amphetamine dependence in brief remission. (Tr. 692).

On April 9, 2007, J. Gange, Ph.D., reviewed Reade's file for the SSA and opined that Reade was capable of simple, repetitive tasks. (Tr. 511-512). Joelle J. Larsen, Ph.D. also reviewed Reade's file on July 15, 2009. (Tr. 552). Dr. Larsen opined that Reade has a marked restriction in activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. (Tr. 552). Dr. Larsen also opined that Reade's substance abuse was material to the determination of disability in this case. (Tr. 542).

Reade testified that he has completed the eighth grade and has not obtained a GED. (Tr. 44-46). Reade worked at Tyson Foods for a time but was fired because he was fighting and he threw an empty trash can at another employee. (Tr. 50-51). He worked as a dishwasher for a time too, but he quit because people kept interrupting his routine to have him do other work. (Tr. 62). Reade last worked as a telemarketer in April 2008. (Tr. 51). He had difficulty with customers "everyday or every other day" while he was a telemarketer and he would pass the phone to his supervisor "instead of getting angry or yelling at the phone . . ." (Tr. 57-58). He worked as a telemarketer for three hours each day, but

he could not work more than four hours per day because of the stress. (Tr. 59). He believes "pressure" keeps him from working. (Tr. 52).

Reade testified that he has had trouble sleeping. Before he started taking rozerem he had trouble "[shutting his] mind down enough to relax to go to sleep . . . ." (Tr. 57).

Ms. Reade, Reade's mother, testified that she worked with Reade when he was washing dishes. (Tr. 64). She explained that he had trouble with people breaking his routine. (Tr. 64). "He would get very aggravated," she explained, and she "would have to go back and talk to him to calm him down." (Tr. 64-65). She explained that Reade "throws things" when he gets really upset and has done this since childhood. (Tr. 64-65).

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for

the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings.  *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that she is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1).  To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:   Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3:   Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to step 4.

Step 4:     Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to step 5, where the burden of proof shifts to the Commissioner.

Step 5:     Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); see also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Reade suffered from severe mental impairments that significantly affected his ability to work. The ALJ further found that Reade did not meet or medically equal one of the listed impairments but retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations:

> the claimant is unable to perform work that imposes close regimentation of production. The claimant is unable to address work that imposes intense and direct personal contact with the public or strangers. Such work exposes employees to the emotional challenges of strangers who may have a personal response that disturbs sensitive individuals. For example, customers with emergencies or extreme dissatisfaction with service or products can display intense anger or despair that makes contact with them very uncomfortable. The claimant cannot work closely with fellow employees, or successfully maintain frequent communication and personal contact with others. This limitation does not imply a need for solitude, but defines the importance of independence.

(Tr. 17). The ALJ also provided the following explanation of "close regimentation of production" in a footnote:

-9-

> Close regimentation of work activity is a consequence of certain operational demands for functioning within close tolerances or for an unusually rapid level of productivity. Such work is characterized by rigid expectations, close and critical supervision that might be required when there is a high value placed by the employer on the product quality, the raw materials, the equipment employed, or upon coordination with other workers and the pace of production. Close and critical supervision in this context would produce unacceptable distress. This work is different from jobs that allow the employee some independence in determining either the timing of different work activities, or the pace of work. Such flexibility as that in the work structure permits the employee an opportunity to catch up with ordinary productivity, especially when there has been a respite.

(Tr. 17).

After considering Reade's age, education, work experience and RFC, the ALJ determined that Reade was capable of performing his past relevant work as a telemarketer and dishwasher. Despite this finding, the ALJ proceeded to step 5 of the sequential analysis. Relying upon the testimony of a vocational expert, the ALJ concluded that Reade retained the capacity to perform a significant number of jobs despite his functional limitations, including janitor, industrial cleaner and laundry worker. (Tr. 21).

Reade believes that the ALJ committed three errors requiring reversal. First, Reade argues that the ALJ failed to consider the opinions of the State agency psychological consultants. Second, Reade argues that the ALJ failed to adequately assess his credibility. Lastly, Reade argues that the ALJ failed to meet his

-10-

burden at step 5. Because credibility is determinative, the Court begins with that issue.

Credibility

Reade argues that the ALJ improperly discredited his testimony in violation of SSR 96-7p by failing to consider the factors set forth in the regulation and failing to explain how those factors supported his conclusion. In short, Reade argues that the ALJ relied on meaningless boilerplate language without any meaningful explanation of which facts, if any, undermined his credibility. The Commissioner disagrees.

Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

Further, "the ALJ cannot reject a claimant's testimony about limitations on [his] daily activities solely by stating that such testimony is unsupported by the medical evidence." *Id*. Instead,

the ALJ must make a credibility determination that is supported by record evidence and sufficiently specific to make clear to the claimant, and to any subsequent reviewers, the weight given to the claimant's statements and the reasons for the weight.  *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply with the requirements of SSR 96-7p.  *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002).  This ruling requires ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  SSR 96-7p.  Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

>    6.   Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
>    7.   Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; C.F.R. §§ 404.1529, 416.929; *Golembiewski*, 322 F.3d 912, 915-16 (7th Cir. 2003).

Here, ALJ Bernstein determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 19). Nearly identical language was criticized by the Seventh Circuit in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). That criticism will not be repeated here. The boilerplate language utilized by ALJ Bernstein is unhelpful at best, and by itself, such language is inadequate to support a credibility finding. *See Richison v. Astrue*, No. 11-2274, 2012 WL 377674 (7th Cir. 2012).

Where boilerplate language such as that utilized by the ALJ is accompanied by additional reasons, a credibility determination need not necessarily be disturbed if otherwise adequate. *Id.* The Commissioner argues that the ALJ's opinion contains more that mere boilerplate language in support of her credibility determination.

-13-

According to the Commissioner:

> In evaluating Plaintiff's credibility, the ALJ discussed Plaintiff's daily activities as described by Theresa Gose, his friend, and by Betty Reade, his mother (Tr. 18). Ms. Gose noted that Plaintiff had no problem with personal care (e.g. dressing, bathing, feeding himself, etc.) (Tr. 256) and that he occasionally did work around the house (Tr. 257). Ms. Reade also reported no problems with Plaintiff's personal care (Tr. 250) and stated that he prepared his own lunch and helped her to cook supper (Tr. 350-51). These factors, considered in light of the medical evidence, suggested to the ALJ that Plaintiff's mental limitations were no greater than those found by the ALJ.

(DE 22 at 8-9).

In his opinion, the ALJ outlined the process for determining a claimant's RFC, including the need to make a credibility finding where statements about the intensity, persistence, of functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence. (Tr. 18). The ALJ then briefly summarized the claimant's testimony as follows:

> At the hearing, the claimant testified that he suffered from depression and an inability to respond appropriately to conflict with others, which made it hard for him to perform his daily activities. The claimant indicated that his condition prevented him from getting a full night's sleep (Exhibit 19E, pg 2).

(Tr. 18). He then offered similar short summaries of the statements of both Theresa Gose and Betty Reade, noting that each of their statements were, at least in part, given persuasive weight because of their close relationships with Reade. (Tr. 18). The

ALJ gave persuasive weight to Betty Reade's statements regarding Reade's activities of daily living, but only "some weight" to her statement that Reade had a short temper around others and had difficulty addressing conflict. (Tr. 18). Then, the ALJ included the highly criticized boilerplate paragraph quoted above. (Tr. 19).

The ALJ then proceeded to offer some additional analysis with regard to Reade's RFC by highlighting the medical evidence he relied upon. He considered a mental consultative examination by Dr. Robert Walsh, Psy. D., a physical consultative examination by Dr. Michael Holton, M.D., a report by Dr. Gladys Beale, M.D., and a mental examination by Phoebe Ritter, APN. The only further analysis of Reade's credibility is as follows:

> Although the claimant testified that he suffered from depression and an inability to respond appropriately to conflict with others, which made it hard for him to perform his daily activities, the undersigned does not find these subjective allegations supported by the evidence of record. The claimant indicated that he was able to address his personal care, cook, wash dishes, vacuum, and shop (Exhibit 19E. Pgs. 204). The mental requirements of these activities support the undersigned's conclusion that the claimant was capable of performing work within the parameters of the residual functional capacity described above. The claimant's most recent mental evaluation showed that the claimant had good judgment, low average intellect, and adequate concentration (Exhibit 40F, pg. 19). The undersigned finds that the evidence of record supports a determination that the claimants mental impairments, at most, only intermittently interfered with his daily

>    activities.
>
>    As for the opinion evidence, the record does not contain any opinions from treating or examining physicians indicating that the claimant was disabled or even had limitations greater than those determined in this decision.

(Tr. 19-20).

The ALJ considered some of the factors relevant to determining whether a claimant is credible. The issue this Court must decide is whether it is enough. In other words, is there a logical bridge between the evidence outlined and the ALJ's conclusions?

The ALJ considered the medical evidence, although not the opinion of Dr. Larsen, who believed based on his review of the evidence that Reade had marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, and marked difficulty in maintaining concentration, persistence, or pace. (Tr. 552).

The only other factor the ALJ considered was Reade's activities of daily living. It is not clear from the opinion what it is about Reade's activities of daily living that made the ALJ think Reade's testimony was untruthful. The ALJ does seem to equate an ability to bathe, cook, clean and shop with a capacity to engage in substantial gainful activity. The Seventh Circuit has cautioned against this. *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010)("an ability to engage in 'activities of daily living' (with

only mind limitations) need not translate into an ability to work full time"). In short, the ability to bathe, dress oneself, cook and do laundry do not translate to the ability to engage in the rigors of regular work, and a claimant is not necessarily untruthful if he can engage in these activities but maintains that he is nonetheless unable to engage in substantial gainful employment.

The opinion does not demonstrate that the ALJ considered the factors set forth in SSR 96-7p, and to the extent it does consider the objective medical evidence and Reade's activities of daily living, it fails to demonstrate what it is about this evidence that has led the ALJ to determine that Read is not believable. While there may be facts in the record which the ALJ *could have* utilized in supporting his credibility determination, the ALJ did not make the necessary connections between the facts and his credibility determination. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)(where an ALJ failed to analyze the factors set forth in SSR 96-7p, the ALJ did not build a logical bridge between the evidence and his conclusion that the claimant's testimony was not credible). In the words of Reade's counsel, the opinion "defies meaningful review." (DE 16 at 11). Because the ALJ failed to build a logical bridge between the evidence and his determination that the claimant's testimony was not credible, remand is required.

Reade's Remaining Arguments

Having found remand necessary on the basis of the ALJ's credibility determination, this Court finds no compelling reason to address Reade's remaining arguments in detail.  This Court has considered Riley's request that this Court award benefits rather than remand the case for additional proceedings but finds remand more appropriate here.  On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that the ALJ may build a logical bridge between the evidence and his conclusions.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

DATED: August 09, 2013            /s/ Rudy Lozano, Judge
                                  **United States District Court**